UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

RENEE MITCHELL,

               Plaintiff,

- against -                                      04 Civ. 9189 (CM)(LMS)

VICTORIA HOME, NELLY RAMIREZ, INDIVIDUALLY
AND AS AN EMPLOYEE OF VICTORIA HOUSE
FRANK BLUSZCZ, INDIVIDUALLY AND AS A
SPECIAL INVESTIGATOR OF THE ATTORNEY
GENERAL OF THE STATE OF NEW YORK,

               Defendants.

------------------------------------------------------------x

DECISION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

McMahon, J:

## Introduction

      Plaintiff Renee Mitchell was a certified nursing assistant in the employ of the Victoria

Home, a nursing facility for the elderly located in Ossining, New York. In January 2000, Nelly

Ramirez, a housekeeper employed by the Home, reported to the Home's Executive Director,

Phyllis Bianco, that she had seen Mitchell strike and scream at an elderly resident. In addition to

launching an internal investigation, Bianco reported the alleged conduct to the New York State

Department of Health. Special Investigator Frank Bluszcz of the Medicaid Fraud Control Unit

of the Criminal Division of the Office of the Attorney General of the State of New York was

assigned to investigate.

In Fall 2000, Following Bluszcz's investigation, Mitchell was arrested and charged with one count of wilfully engaging in inappropriate physical contact with a nursing home resident, a misdemeanor of which she was later convicted. Mitchell appealed *pro se* and, on November, 21, 2003, the Appellate Term overturned her conviction as being against the weight of the evidence.

On May 2, 2005, Mitchell filed an amended complaint, naming the Victoria Home, Ramirez, and Bluszcz as defendants and alleging several federal constitutional and state law claims stemming from the termination of her employment and her subsequent prosecution. Defendant Victoria Home moved to dismiss the complaint and defendant Bluszcz moved to dismiss certain claims. On July 12, 2005, this Court granted the motions of defendants Victoria Home and Bluszcz and dismissed *sua sponte* the claims against defendant Ramirez.

Plaintiff's sole remaining claim is her charge of malicious prosecution (pursuant to both 42 U.S.C. § 1983 and New York state law) against defendant Bluszcz (the "defendant"). Defendant now moves for summary judgment on that claim. For the reasons stated below, defendant's motion is granted.

## Facts

In January 2000, plaintiff Renee Mitchell was employed as a certified nursing assistant ("CNA") at the Victoria Home ("the Home"), a nursing home located in Ossining, New York. Amended Complaint ("Am. Cplt.") ¶¶ 10, 14. The Home is a privately-owned, state-certified, not-for-profit nursing facility. www.victoriahome.org.

On January 5, 2000, a housekeeper employed by the Home, Nelly Ramirez, contacted Phyllis Bianco, the Home's Executive Director. Ramirez told Bianco that, on January 1, 2000,

she had heard A.J., a resident of the Home, crying for help, and had then observed Mitchell grabbing, hitting, and screaming at Mrs. J as Mitchell bathed her in the Home's first floor tub room.[1]   Declaration of Phyllis Bianco ("Bianco") ¶ 3.   Ramirez also told Bianco that, upon witnessing this scene, she asked a nearby nurse, Linda Walker, to investigate, but she declined, noting that Mrs. J simply didn't like bathing.   Ramirez also informed Bianco that another CNA, Judith McIntosh, had witnessed the incident and alerted plaintiff when a nurse, Brenda Keesler, approached.   Id..

The Home's Investigation

After conversing with Ramirez, Bianco commenced an investigation into whether or not Mitchell had, in fact, abused Mrs. J.   She asked both Marjorie Upham, the Home's Director of Nursing, and Dr. Albert Riddle, the Home's Medical Director, to examine marks which were found on Mrs. J's neck, mid-sternal area, and wrist.   Bianco ¶¶ 4, 6; see also Declaration of Marjorie Upham, R.N. ("Upham") ¶¶ 3-4.   While Mrs. J could not recall when or how the discolorations on her neck and chest first appeared, and denied that she had been assaulted, Dr. Riddle concluded Mrs. J's comments were not reliable due to short-term memory problems consistent with dementia.   Declaration of Albert Riddle, M.D. ("Riddle") ¶¶ 4-5.   Based on blood tests and the resident's medical history, Riddle concluded that the marks were caused by trauma, in the form of either a constant application of pressure or a blunt blow to that area.   Id. ¶¶ 6-12.   Riddle further concluded that the bruises were unlikely to have resulted from

---

[1] While the initial Complaint identified the resident by her full name, the Amended Complaint and subsequent filings have identified her either by her initials or as "Mrs. J."

accidentally banging into something, and that it was "improbable" that the bruises were caused by Mrs. J's jewelry.  Id. ¶ 13.  In February 2000, separate bruises on Mrs. J's person were attributed to a necklace which she wears; however, these bruises were apparently smaller than those seen on January 1.  See Plaintiff's Exhibit DD; Plaintiff's Exhibit CC.

On January 6, 2000, the Home began interviewing employees who were on duty at the time of the incident, including the four whom Ramirez had identified as being in the vicinity of the alleged misconduct: plaintiff, McIntosh, Walker, and Keesler.  Bianco ¶¶ 7, 10.  Mitchell noted that she had not noticed a bruise on Mrs. J's neck when giving her a bath, nor did she remember the resident yelling or screaming.  In addition, Mitchell noted that McIntosh had twice "stuck her head in" to the tub room while Mrs. J was bathing.  See Defendant's Exhibit 8. McIntosh also stated that she did not recall seeing any bruises on Mrs. J on the morning of January 1, nor did she remember hearing the resident cry.  However, she added that she had not looked into the tub room on the day in question and, in fact, did not even recall who had bathed the resident.  See Defendant's Exhibit 9.  Walker told Bianco that she had heard Mrs. J crying, but dismissed it as "typical" behavior for the resident while being bathed.  However, she added that later that day Mrs. J "was really upset [and] really crying," and that Mrs. J then told her that Mitchell had called her a "dirty jew."  Defendant's Exhibit 11.  Keesler, who had been the desk nurse on duty during the time of the alleged incident, stated that she had heard Mrs. J cry later that day and that she had been asked to look at bruising on Mrs. J's neck sometime that day, probably in the morning.  See Defendant's Exhibit 10.

After finishing this first round of interviews, Bianco concluded that it was possible that Mitchell had had inappropriate physical contract with Mrs. J, and she therefore reported the

incident to the New York State Department of Health ("DOH").  Bianco ¶¶ 12-13.  The Home continued its investigation over the next three weeks, and, on January 28, after concluding that Mitchell was "probably responsible" and that McIntosh had "probably witnessed" the incident without reporting it, Bianco terminated the women's employment.  Also fired was Walker, who had been in the vicinity of the incident without reporting it.  Id. ¶¶ 16-21, 23-26.


## SI Bluszcz's Investigation

Sometime between the 6th and 12th of January, DOH referred Bianco's report of the alleged incident to the Medicaid Fraud Control Unit ("MFCU") of the Criminal Division of the Office of the Attorney General of the State of New York ("OAG").  Declaration of Nancy Calo-Kenney ("Calo-Kenney") ¶ 11.  Nancy Calo-Kennedy, who was the Supervising Special Investigator in MFCU's Pearl River regional office, assigned the case to defendant Special Investigator ("SI") Frank Bluszcz.  Id. ¶¶ 4, 12.  Bluszcz began his investigation of the alleged incident by visiting the Home on January 12 and meeting with Bianco, who advised him of the status of the internal investigation.  Id. ¶ 13; see also Declaration of Frank Bruszcz ("Bruszcz") ¶ 7.  Bianco supplied Bluszcz with copies of the documents that the Home had gathered in the course of its investigation, including employees' statements, Dr. Riddle's notes, and photos of Mrs. J's injuries.  Bluszcz ¶ 9; Bianco ¶¶ 21-22.

Thereafter, Bluszcz initiated his own investigation.  Pursuant to MFCU practice, he interviewed the Home's employees while accompanied by other MFCU employees, typed up witness interview reports ("SP2s"), and sent frequent memorandums to Calo-Kenney.  Bluszcz ¶¶ 5, 11.  On January 14, he interviewed McIntosh after Bianco had told him that the two

statements she had given to the Home were inconsistent with each other and with those given by other employees. McIntosh told Bluszcz that Mitchell had bathed Mrs. J on January 1, but that she did not recall any bruises or any crying. Pressed by Bluszcz, she stated that, despite her earlier statements to the contrary, she was on the second floor at the time in question, not on the first floor where the incident had occurred. Id. ¶¶ 12-13; see also Defendant's Exhibit 40. After Bluszcz discussed his preliminary investigation with Calo-Kenney, the MFCU decided that there was sufficient evidence of abuse to formally open a case. Therefore, the case was opened and Special Assistant Attorney General ("SAAG") Gilbert Epstein was assigned the matter. Calo-Kennedy ¶ 14; Bluszcz ¶ 14.

On January 28, Bluszcz interviewed Ramirez, accompanied by Calo-Kenney, who served as a translator. Calo-Kenney ¶ 15; Bluszcz ¶ 15. Ramirez, who speaks some English, was accompanied by a translator every time she gave a statement regarding this incident. See Upham ¶ 7; Bluszcz ¶ 15. Ramirez repeated what she had previously told Bianco, noting that, on January 1, she had heard Mrs. J crying "Help me! Help me!" and observed Mitchell hitting the resident on her neck and chest. Defendant's Exhibit 34. She added that Mitchell was "pulling Mrs. J by the skin of her chest." Id.. Ramirez noted that McIntosh was present in the tub room at this time, that she saw plaintiff hit Mrs. J, and that she warned plaintiff that "Brenda [Keesler] is coming." Id. Ramirez added that Mrs. J normally cried while being bathed, but that this was not her "normal cry," as it was "much louder and she cried out for help." Id.

Bluszcz continued his investigation by interviewing nurses Walker and Keesler. Bluszcz ¶¶ 16-17. Walker, who was interviewed on February 1, noted that on January 1, she could hear Mrs. J crying while in the tub room. Defendant's Exhibit 42. Keesler, whom Bluszcz

interviewed on January 28, noted that she had heard the resident crying in her room, not the tub room, but that she was crying "more than ever before." Defendant's Exhibit 41; see also Bluszcz ¶¶ 16-17. Walker noted that while Mrs. J told her that Mitchell had called her a "dirty jew," she had indicated that she had not been physically abused. Defendant's Exhibit 42. Keesler, however, noted that she believed that Mitchell had abused Mrs. J, a conclusion she drew based on the bruises she had seen. Defendant's Exhibit 41.

On March 17, Bluszcz interviewed Sister Peter Frances, a registered nurse at the home who was on duty at the time of the incident. Sister Frances told him that Mrs. J's "crying and moaning" on January 1 was "highly unusual." However, she was unable to recall anyone informing her that Mrs. J had been assaulted. Defendant's Exhibit 43. When she was re-interviewed on March 27, Sister Frances added that on January 1, she had seen Ramirez, who looked visibly upset, and that Ramirez had said "Ms. J and Rene[e]." Sister Frances had told Ramirez to bring her complaint to Keesler. Defendant's Exhibit 45; see also Bluszcz ¶ 25.

As part of his investigation, Bluszcz attempted to interview Mitchell as well. Twice he went to her home, and once he left a phone message for her. Eventually, Mitchell returned his call, telling him that she had retained a lawyer. After that, Bluszcz made no further attempt to speak with Mitchell. Bluszcz ¶ 21.

On or about May 2, 2000, the Home fired Keesler for admittedly spitting at a Home resident, and Bluszcz was once again assigned to investigate. On May 4, he went to Keesler's residence, both to ask her about the spitting incident and to seek further information regarding Mrs. J's case. After discussing the spitting incident, Bluszcz attempted to elicit more information about Mrs. J's case by telling Keesler that she was going to be arrested for the

spitting incident and that anything she could tell him about the earlier case would be helpful.  At this point, Keesler requested a lawyer and refused to answer any more questions.  Bluszcz ¶ 27.  On May 22, Bluszcz again interviewed Keesler, with her husband and attorney present, as well as SAAG Epstein and MFCU Regional Director Kate Everett.  During this interview Keesler largely recounted everything she had previously told the investigator, including that the resident's crying on January 1 was a "depressed or sort of sad cry."  Defendant's Exhibit 48.  However, Keesler added that the earlier statement that Bluszcz had taken indicating that she thought abuse had occurred was incorrect; instead, she stated that she did not believe the incident had taken place.  Id.

Bluszcz and Calo-Kenney returned once again to the Home on November 16, 2001 to interview another employee, Maria Beato, who had indicated that she had new information regarding the case.  Beato told the investigators that on January 2, 2000, Mrs. J had told her that Mitchell "did bad things to me."  Defendant's Exhibit Z.

Throughout his investigation, Bluszcz provided his SP2s and memoranda to Calo-Kenney, who in turn provided them to MFCU prosecutors, as per MFCU protocol.  Bluszcz ¶ 29; see also Declaration of Thomas Staffa ("Staffa") ¶ 5.  According to MFCU practice, after the investigator's materials have been supplied to prosecutors, it is the prosecutors alone who make the decision as to whether or not sufficient probable cause exists to prosecute.  Bluszcz ¶ 30; Staffa ¶¶ 6-7.


Procedural History

By the fall of 2000, MFCU prosecutors had made the decision to charge plaintiff with

one count of wilfully engaging in inappropriate physical contact with a nursing home resident in violation of Public Health Law §§ 12-b(2) and 2803-d(7) and 10 NYCRR § 81.1(a), an unclassified A misdemeanor. Bluszcz ¶ 31. As per MFCU practice, Ramirez signed a "Supporting Deposition" prepared by SAAG Epstein. See Defendant's Exhibit 39; Bluszcz ¶ 32; Staffa ¶ 7. In addition, Epstein prepared an Information charging plaintiff with the Public Health Law violation and Bluszcz signed it. In it, Bluszcz stated that, "upon information and belief," plaintiff has engaged in inappropriate physical conduct with the resident. See Defendant's Exhibit 39; Bluszcz ¶ 34.

On October 24, 2000, plaintiff was arrested at the Ossining Police Station, arraigned at the Ossining Justice Court, then released. Bluszcz ¶ 35; see also Declaration of Renee Mitchell ("Mitchell") ¶ 23. On March 12, 2002, a jury trial on the charge was conducted before the Hon. Raymond Barlaam of the Village Court of the Village of Ossining. Am. Cplt. ¶ 65; see also Defendant's Exhibit 58. Dr. Riddle testified that Mrs. J's bruises did not have a medical cause and that it was "improbable" that they were caused by her jewelry. Plaintiff's Exhibit LL at 124. Bluszczcz did not testify at the trial. Bluszcz ¶ 36. The jury returned a guilty verdict, and plaintiff was later sentenced to 45 days in jail and three years of probation. Am. Cplt. ¶ 69; Ramirez ¶ 24.

Plaintiff appealed her conviction *pro se*. See Defendant's Exhibit 54. On appeal, plaintiff argued that her lawyer had not adequately represented her, and that there were medical explanations that might explain Mrs. J's bruising which Dr. Riddle had overlooked. Id. To support her theories, plaintiff attached several internet printouts on the effects of Mrs. J's medication and bruising in the elderly in general. Id. On November 21, 2003, the Appellate

Term reversed plaintiff's conviction as against the weight of the evidence.  <u>People v. Mitchell</u>, 1 Misc. 3d 130(A), 781 N.Y.S.2d 627 (App. Term 9th and 10th Dists. 2003).

On November 19, 2004, Mitchell brought suit alleging several federal constitutional and state law claims stemming from the termination of her employment and her subsequent prosecution.  <u>See</u> Complaint.  On May 2, 2005, she filed an amended complaint.  In the amended complaint, plaintiff lodged claims against Victoria Home, Ramirez, and Bluszcz.  <u>See</u> Am. Cplt.  Defendant Victoria Home moved to dismiss the complaint and defendant Bluszcz moved to dismiss certain claims.  On July 12, 2005, this Court granted the motions of defendants Victoria Home and Bluszcz and dismissed *sua sponte* the claims against defendant Nelly Ramirez.  The only claim not dismissed by the court was plaintiff's charge of malicious prosecution (pursuant to both 42 U.S.C. § 1983 and New York state law) against defendant Bluszcz, which he had not moved to dismiss.  Defendant now moves for summary judgment on that claim.

**Discussion**

<u>Standard of Review</u>

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548 (1986); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505 (1986). Furthermore, "'the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' When no such showing is made, '[t]he moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she had the burden of proof.'" <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 884, 110 S.Ct. 3177, 3187 (1990) (citing <u>Celotex</u>, 477 U.S. at 322-23, 106 S.Ct. at 2552) (internal citations omitted). On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. See <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); <u>Donahue v. Windsor Locks Bd. of Fire Commn'rs</u>, 834 F.2d 54, 57 (2d Cir. 1987).

<u>Discussion</u>

For the reasons set forth below, Defendant Bluszcz's Motion for Summary Judgment is granted.

To establish a claim for malicious prosecution under New York law, a plaintiff must show "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." <u>Posr v. Court Officer Shield # 207</u>, 180 F.3d 409, 417 (2d Cir.1999) (citing <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir.1997)). In addition to the elements required to establish a claim of malicious prosecution under state law, to allege a cause of action under 42 U.S.C. § 1983, a plaintiff must further assert "that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." <u>Rohman v. NY.C. Transit Auth.</u>, 215 F.3d 208, 215 (2d Cir.2000) (citing <u>Murphy v. Lynn</u>, 118 F.3d 938, 944-46 (2d Cir.1997)). The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure; in other words, it is the right to be free of "unreasonable or unwarranted restraints on personal liberty." <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 116 (2d Cir.1995). Therefore, to sustain a § 1983 claim for malicious prosecution, there must be a deprivation of liberty which arises "pursuant to the legal process." <u>Id.</u> at 116-117 (quoting <u>Heck v. Humphrey</u>, 512 U.S. 477, 484, 114 S.Ct. 2364, 2371 ((1994)); <u>see also</u> <u>Brome v. City of New York</u>, 2004 WL 502645, at *5 (S.D.N.Y. Mar. 15, 2004) (citing <u>Singer</u>, 63 F.3d at 116-17).

In his memorandum of law in support of his motion for summary judgment, defendant acknowledged that plaintiff had the requisite post-arraignment deprivation of liberty required for

a § 1983 malicious prosecution cause of action. Defendant also admitted that the second element of a malicious prosecution claim was satisfied, in that the criminal proceedings had terminated in the plaintiff's favor. See Defendant's Memorandum of Law ("Defendant's Memo") at 13. In moving for summary judgment, however, defendant asserts that plaintiff cannot make a showing on the remaining three elements of a malicious prosecution claim: that the defendant initiated or continued the plaintiff's prosecution, that there was no probable cause to charge plaintiff, and that the criminal proceedings were instituted with malice. Id. Because plaintiff is unable to make these requisite showings, defendant's motion is granted.

To satisfy the first element of a malicious prosecution claim (that the defendant initiated or continued the criminal proceedings against the plaintiff), "it must be shown that the defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." DeFilippo v. County of Nassau, 183 A.D.2d 695, 696, 583 N.Y.S.2d 283, 284 (2d Dept. 1992) (quoting Viza v. Town of Greece, 94 A.D.2d 965, 966, 463 N.Y.S.2d 970, 971 (4th Dept. 1983). Further, "One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." Rohman, 215 F.3d at 217 (quoting Present v. Avon Prods., Inc., 253 A.D.2d 183, 189, 687 N.Y.S.2d 330, 335 (1st Dept. 1999). Of course, the standard is different for law enforcement officers than it is for laymen. In malicious prosecution cases brought against police officers, plaintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints. Llerando-Phipps v. City of New York, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005). Further, "Although there is a presumption that a prosecutor exercises independent judgement in

deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.'" Brome, 2004 WL 502645 at *5-6 (citing Ricciuti, 124 F.3d at 130), or when she withholds relevant and material information. Ramos v. City of New York, 285 A.D.2d 284, 299, 729 N.Y.S.2d 678, 690 (1st Dept. 2001).

Plaintiff fails to rebut the presumption that the MFCU prosecutors initiated the proceeding against her. While she attempts to show that defendant tried to fabricate evidence against plaintiff by threatening to arrest McIntosh, Am. Cplt. ¶ 47, this assertion is not supported by the record. Further, regardless of what tactics defendant did or did not use, McIntosh did not provide defendant with any incriminating evidence, falsified or otherwise. Plaintiff further alleges in the Amended Complaint that defendant sought to exaggerate the testimony of Nelly Ramirez and prepared statements regarding her observations which he knew to be false. Am. Cplt. ¶¶ 43-46, 48-49. Again, the facts before this Court are inadequate to support plaintiff's burden of production. It is also alleged that an accusatory instrument was "prepared by or at the direction of" defendant. Id. ¶ 52. However, plaintiff has introduced no evidence to support this assertion, while the defendant has specifically indicated that such instrument was prepared by SAAG Epstein. Bluszcz ¶¶ 30, 32, 34.

Plaintiff argues that "the 'investigation' and 'prosecution' phases of the prosecution at times seem indistinguishable." Plaintiff's Memorandum of Law ("Plaintiff's Memo") at 2. However, this assertion is belied by the records; it seems apparent that defendant went about his job as a special investigator by conducting an investigation and reporting his findings to his

superiors. Bluszcz ¶¶ 29-30; <u>see also</u> Staffa ¶¶ 4-6. Neither his post-arraignment interview with Maria Beato, nor his deposition testimony that he had "input" with prosecutors, <u>see</u> Plaintiff's Exhibit JJ at 22, is enough to indicate that defendant was responsible for initiating or continuing plaintiff's prosecution. The plaintiff is unable to show that defendant either created false information or withheld material evidence. In fact, none of plaintiff's assertions are sufficient to rebut the presumption that the criminal proceedings were initiated by MFCU prosecutors.

Because plaintiff is unable to show that defendant initiated or continued the criminal proceedings against her, her claim of malicious prosecution must fail.

However, even if defendant were found to be responsible for initiating plaintiff's prosecution, his motion for summary judgement would be granted on the grounds that there was probable cause to arrest and charge plaintiff.

Probable cause exists "when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." <u>Golino v. City of New Haven</u>, 950 F.2d 864 (2d Cir. 1991) (citing <u>Dunaway v. New York</u>, 442 U.S. 200, 208 n.9, 99 S.Ct. 3348, 3354, n.9 (1979)). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." <u>Boyd v. City of New York</u>, 336 F.3d 72 (2d Cir. 2003) (citing <u>Colon v. City of New York</u>, 60 N.Y.2d 78 (1983). Furthermore, a presumption of probable cause is created by a criminal conviction; "A conviction establishes the existence of probable cause which, even when the conviction is reversed on appeal, becomes a rebuttable presumption." <u>Sassower v. City of White Plains</u>, 1993 WL 378862, at *3 (S.D.N.Y. 1993). This presumption can be rebutted only

by a showing that the conviction itself was a result of fraud, perjury, or other unethical acts on the part of the defendant which affected the integrity of the prosecution. Id..

As noted above, plaintiff attempts to rebut the presumption that probable cause existed by alleging that defendant fabricated evidence. She offers no evidence of attempted fabrication, however. Also unavailing are plaintiff's complaints regarding the alleged inconsistencies in Nelly Ramirez's various statements given to Bianco and to defendant. After all, in each statement, given in the presence of different translators, Ramirez recounted essentially the same thing: that plaintiff had inappropriate contact with Mrs. J. Plaintiff's assertion that defendant lacked probable cause because Ramirez was not credible, owing to her "delusions" and "animus against the plaintiff," Defendant's Memo at 7, is similarly unconvincing. Finally, plaintiff's assertion that "defendant was driven to investigate only those witnesses who supported his theory" is not misconduct sufficient to show a lack of probable cause. Id. at 6. "To whatever extent individual officers failed to follow some leads or failed to accurately take notes evinces only carelessness rather than malice." Ramos, 285 A.D.2d at 301, 729 N.Y.S.2d at 691.

Plaintiff also argues that there are explanations for the bruises found on Mrs. J other than abuse at plaintiff's hand. Defendant's Memo at 3-6. For example, plaintiff suggests that the bruises may have been caused either by defendant's jewelry or by medication which she was taking. Id. at 4-6. But, while plaintiff may be correct that a physical assault was not the only possible explanation for the bruises, the existence of other conceivable explanations is not enough to overcome the presumption that probable cause existed. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate

every theoretically plausible claim of innocence before making an arrest." <u>Ricciutti</u>, 124 F.3d at 128 (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145-46, 99 S.Ct. 2689, 2695-96 (1979)). Furthermore, probable cause was created by the reasonably reliable information given to the defendant by Dr. Riddle, the resident's treating physician, Ramirez, an alleged eyewitness, and Sister Frances. Therefore, plaintiff is unable, as a matter of law, to demonstrate that defendant lacked probable cause.

Because plaintiff is unable to satisfy the first and third elements of malicious prosecution, it is unnecessary to examine whether or not the fourth element (that the criminal proceedings were instituted with malice) was satisfied. It is likewise unnecessary to address defendant's claim that he is entitled to qualified immunity.

**Conclusion**

For the reasons stated above, defendant's motion for summary judgment on plaintiff's claim of malicious prosecution is granted.

This constitutes the decision and order of the Court.

Dated: June _5_, 2006

_____
U.S.D.J.